IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 04-cv-01071-MSK

SAN LUIS VALLEY ECOSYSTEM COUNSEL,
NANCY ALBRIGHT,
JAMES MARTIN,
JERRE GUTHALS,
ANTLERS RIO GRANDE LODGE, INC., a Colorado corporation,
CHARLES C. POWERS,

        Plaintiffs,

v.

UNITED STATES FOREST SERVICE,

        Defendant

and

ALXCHNG, LLC, a Texas limited liability company,
CNXCHNG, LLC, a Texas limited liability company,
RIO OXBOW RANCH, INC., a Colorado corporation,

        Intervenors.

---

**MEMORANDUM OPINION AND ORDER REVERSING AGENCY DECISION AND
REMANDING FOR FURTHER PROCEEDINGS**

---

THIS MATTER comes before the Court on the Plaintiffs' appeal from Defendant United

States Forest Service's decision to approve an exchange of federal lands for non-federal lands.

Some of the parcels at issue are located along the Rio Grande National Forest near Creede,

Colorado; others are located several miles to the west or southeast of Creede.

Before the Court are the parties' appellate briefs (**#82, #95, #96, #98**), their supplemental

authority (**#103, #105, #107, #110, #112**), the administrative record (**#6, #62, #73, and #81**), and

several affidavits (**#85**).[1]  Having considered the parties' written and oral arguments, the

administrative record,[2] and the applicable law, the Court finds and concludes as follows.

## I.  Jurisdiction

The Plaintiffs seek judicial review pursuant to the Administrative Procedures Act, 5

U.S.C. §§ 701-706.  They assert substantive claims under the National Environmental Policy Act,

42 U.S.C. §§ 4321-4370(c), the Federal Land Policy and Management Act, 43 U.S.C.

§ 1716(b), and the National Forest Management Act, 16 U.S.C. § 1604.  Therefore, the Court

exercises subject matter jurisdiction pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331.

## II.  Issue Presented

This case concerns an exchange of federal lands for non-federal lands.  The Plaintiffs are

four individuals, a group of citizens, and a corporation who oppose the exchange.  The Defendant

is the United States Forest Service ("the Agency"), which approved the exchange.  The

Intervenors are ALXCHNG, LLC, CNXCHNG, LLC and the Rio Oxbow Ranch, Inc., and all are

parties to a land exchange agreement with the Agency.[3]

When there is a proposed exchange of federal lands for private lands, the National

Environmental Policy Act ("NEPA") requires the Agency to take a "hard look" at the proposed

action to determine what impact the proposed action will have on the human environment.  *See*

---

[1] Pursuant to the parties' agreement and a Court Order (**#93**), the affidavits are pertinent only to the Plaintiffs' standing on Claims 1 and 2, described *infra*.

[2] The administrative record is voluminous and consists of four banker's boxes of documents.  The Court has read the entire record, but addresses only its pertinent portions in this opinion.

[3] Although it is the Court's preference to refer to all parties by name, the varied nature of the Plaintiffs and Intervenors makes this impracticable.  Therefore, the Court refers to the Plaintiffs and the Intervenors based upon their status in this lawsuit.  The Court refers to the Defendant as "the Agency," whose decision is subject to review.

*Citizens' Committee to Save Our Canyons v. United States Forest Service,* 297 F.3d 1012, 1021-22 (10th Cir. 2002); *Committee to Preserve Boomer Lake Park v. Dept. of Transp.,* 4 F.3d 1543, 1554 (10th Cir. 1993); 36 C.F.R. § 254.3(g).[4]   Unless a categorical exclusion[5] applies, this "hard look" requires the preparation of either an environmental assessment ("EA"), or an environmental impact statement ("EIS").  *See Utah Environmental Congress v. Bosworth,* 443 F.3d 732, 736 (10th Cir. 2006); *see also* 40 C.F.R. § 1501.4.[6]   Often, an agency begins by preparing an EA, which is more concise and less detailed than an EIS.  *See Committee to Preserve Boomer Lake Park,* 4 F.3d at 1554; 40 C.F.R. § 1508.9.  Based upon the EA, the agency then decides whether an EIS is necessary.  *See* 40 C.F.R. § 1501.4(c).

An EIS is required for federal actions "significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C); *see also Colorado Wild v. United States Forest Service,* 435 F.3d 1204, 1209 (10th Cir. 2006).  A federal action "affects" the environment when it "will or <u>may</u> have an effect" on the environment.  40 C.F.R. § 1508.3 (emphasis added).  Thus, an EIS is required if the agency finds that the proposed action may have a significant impact on the

---

[4] NEPA has two primary goals: (1) to force the government to take a "hard look" at the environmental impacts of proposed actions; and (2) to require the government to inform the public of such impacts and explain how the government's decisions address environmental impacts.  *Citizens' Committee to Save Our Canyons,* 297 F.3d at 1021-22.

[5] A categorical exclusion may apply when the proposed action has been predetermined not to individually or cumulatively have a significant effect on the human environment. *See Utah Environmental Congress,* 443 F.3d at 736.  This case involves no categorical exclusions.

[6] The EIS requires the "most rigorous analysis."  *See Utah Environmental Congress,* 443 F.3d at 736.  An EA need only include a brief discussion of why the proposal is necessary, consideration of reasonable alternatives to the proposed project, discussion of the project's singular and cumulative impacts, a listing of agencies and persons consulted, and a sufficiently detailed analysis to allow the decision maker to determine whether an EIS is required.  *Davis v. Mineta,* 302 F.3d 1104, 1118, 1125 (10th Cir. 2002); 40 C.F.R. § 1508.9(b); *see also* 40 C.F.R. § 1508.7 (defining "cumulative impact").

human environment.  *See Utah Environmental Congress,* 443 F.3d at 736.  However, if the

agency concludes, based upon the EA, that there will be no significant impact, it may issue a

Finding of No Significant Impact[7] without preparing an EIS.  *Citizens' Committee to Save Our*

*Canyons,* 297 F.3d at 1022; 40 C.F.R. §§ 1508.13 & 1501.4(e).  In this case, the Agency

prepared an EA.  Then, on January 20, 2004, it made a Finding of No Significant Impact and

simultaneously approved the exchange.

In their Second Amended Complaint, the Plaintiffs assert six claims challenging the

Finding of No Significant Impact and the approval of the exchange as being arbitrary and

capricious.[8]  Of these claims, the Court finds it necessary to address only Claim 6 – that the

decision not to obtain an EIS and instead to issue a Finding of No Significant Impact violated

---

[7] A Finding of No Significant Impact briefly explains why the proposed action will not have a significant effect on the human environment.  It must include a summary of, or incorporate, the EA, and must refer to any related environmental documents.  40 C.F.R. § 1508.13. The Finding of No Significant Impact is often referred to, colloquially, as a FONSI.

[8] In Claim 1, they allege that the decision was based on facially inadequate appraisals and therefore in violation of the Federal Land Policy and Management Act ("FLPMA").  In Claim 2, they allege that the public was not allowed to comment on the appraisals in violation of the FLPMA.  In Claim 3, they allege that they were denied a right of appeal when the Agency entered into a binding agreement to exchange the lands less than 15 days after the exchange was approved.  In Claim 4, they allege that the criteria for a land exchange under the Rio Grande National Forest Plan were not met in violation of the FLPMA.  In Claim 5, they allege that the exchange violates the FLPMA because it includes federal lands located within the Silver Thread National Scenic Byway, will alienate deer and elk winter range, will have a detrimental impact on the local economy, and will result in the loss of recreational lands, including two sections of the Rio Grande River and a geological site of scientific interest.  They also allege that the Finding of No Significant Impact lacked factual support, and an EIS should have been prepared.  In Claim 6, they allege that the Agency violated NEPA because an EIS was required, for essentially the same reasons as in Claim 5.

As to Claims 1 and 2, the Agency and Intervenors contend that the Plaintiffs lack standing to challenge the valuation of the parcels.  The Agency also contends that the Plaintiffs failed to exhaust administrative remedies with regard to their critiques of the appraisal process and issues pertaining to management indicator species.  For the reasons set forth below, it is not necessary for the Court to address these contentions.

NEPA, making the decision to approve the exchange arbitrary and capricious.[9]

The Plaintiffs claim that issuance of a Finding of No Significant Impact, rather than obtaining an EIS, violated NEPA because the exchange may have a significant impact on the human environment. They allege that after considering the EA and public comments, the Agency failed to give adequate deference to the impact of the exchange on the local economy, on overall recreational opportunities in the Rio Grande Valley, and the scenic integrity of the area. In particular, they complain that the exchange results in the loss of waterfront property on parcels N2 and L3, the loss of a geological site of scientific interest on parcel N2, and the potential for development on parcels N2 and L5.

The Agency and Intervenors respond that no EIS was required. They contend that the Agency properly considered the applicable NEPA factors as well as alternatives to the exchange. Therefore, they assert that there was no error in the Agency's decision to issue a Finding of No Significant Impact rather than to obtain an EIS.

The issue presented is whether the Agency's decision to forego obtaining an EIS and instead issue a Finding of No Significant Impact violated NEPA, rendering its decision to approve the exchange arbitrary and capricious. For the reasons stated below, the Court concludes that the Agency's decision to issue a Finding of No Significant Impact was arbitrary and capricious.

---

[9] The Court limits its analysis to the NEPA claim because the alleged error in the Agency's process occurred at a procedural crossroad – the Agency could have opted either to obtain an EIS or issue a Finding of No Significant Impact. All other claimed errors follow this decision. As a consequence, error at this step will require the process to begin anew. For example, new appraisals will be required, which would moot Claims 1 and 2.

### III.  Standard of Review

The Plaintiffs' claims are subject to the Administrative Procedures Act ("APA") found at 5

U.S.C. § 701, et seq.  Under 5 U.S.C. § 702:

> A person suffering legal wrong because of agency action, or
> adversely affected or aggrieved by agency action within the
> meaning of a relevant statute, is entitled to judicial review    thereof.
> . . .

In turn, judicial review is governed by 5 U.S.C. § 706, which provides that a court reviewing an

agency's action shall:

> (1) compel agency action unlawfully withheld or unreasonably
> delayed; and
> (2) hold unlawful and set aside agency action, findings, and
> conclusions found to be--
> > (A) arbitrary, capricious, an abuse of discretion, or
> > otherwise not in accordance with law; . . .
> > (D) without observance of procedure required by law; . . .
> In making the foregoing determinations, the court shall review the
> whole record or those parts of it cited by a party, and due account
> shall be taken of the rule of prejudicial error.

This Court may affirm an agency's decision only "on the grounds articulated by the agency

itself."  *Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1565, 1575 (10th Cir. 1994).

"After-the-fact rationalization by counsel in briefs or argument will not cure noncompliance by the

agency[.]" *Id.* at 1575.

Although the "agency's decision is entitled to a presumption of regularity," it is not

shielded from a probing review.  *Id.* at 1574.  When the challenge is that the agency's decision is

arbitrary and capricious, the Court must determine whether the agency examined the relevant data

and factors, and whether it articulated a rational connection between the facts and its decision.  *Id.*

As the Supreme Court instructs in *Motor Vehicle Manufacturers Association of the United*

*States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983):

> [A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

The focus is upon the rationality of the decision making process, not upon the decision itself. *Olenhouse,* 42 F.3d at 1575.

The Court must determine whether there was a clear error in the Agency's judgment. *Id.* at 1574; *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971), *overruled on other grounds, Califano v. Sanders,* 430 U.S. 99, 105 (1977). In doing so, the Court does not substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc.,* 401 U.S. at 416; *Colorado Wild,* 435 F.3d at 1213. It is not the Court's role to weigh conflicting evidence or evaluate credibility. *See Pennaco Energy, Inc. v. United States Dept. of Interior,* 377 F.3d 1147, 1159 (10th Cir. 2004). Indeed, even when the administrative record contains evidence which arguably conflicts with the agency's findings, it does not necessarily render the agency's decision arbitrary and capricious. *See id.* Nor is it the Court's function to decide the propriety of competing methodologies. *See Silverton Snowmobile Club v. United States Forest Service,* 433 F.3d 772, 782 (10th Cir. 2006).

Review of an agency's decision is usually deferential. *See Citizens' Committee to Save Our Canyons,* 297 F.3d at 1021. The deference given "is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise." *Utah Environmental Congress,* 443 F.3d at 739. If the agency's exercise of discretion is truly

informed, then the Court defers to it.  *Utah Shared Access Alliance v. United States Forest Service,* 288 F.3d 1205, 1213 (10th Cir. 2002).  However, if the record shows that the agency prejudged the issues, then deference to the agency's decision is diminished.  *See Davis,* 302 F.3d at 1112.

The arbitrary and capricious analysis also requires the Court to conduct a plenary review of the administrative record to see whether there are facts which support the agency's decision. *Olenhouse,* 42 F.3d at 1575-76.  "Evidence is substantial in the APA sense if it is 'enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion to be drawn is one of fact.'" *Id.* at 1575.  To be substantial, evidence must be more than a scintilla; "it must be such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1581.  If evidence is overwhelmed by other evidence, or if it is simply a conclusion, then it is not substantial.  *Id.*

### IV.  Material Portions of the Administrative Record

### A.  The Exchange

The Agency has agreed to exchange 469.79 acres of federal land (parcels N1, N2, N4, N5, N6, L1, L2, L3, L4, L5) located near Creede, Colorado, and valued by an appraiser at $1,493,500, for 814.91 acres of the Intervenors' private land (parcels LR1, LR2, LR3, LR4, LR5, B3, B4, Hays Placer, and Continental Divide Claims), valued by the appraiser at $1,598,000.  The Agency also has agreed to pay the Intervenors $104,500 to equalize the values.  Pursuant to a stipulation and Court Order (**#27**), the exchange has not yet occurred.

Federal parcels L1, L2, L3, L4, L5 (totaling 239.87 acres) are neighbors of non-federal parcels LR1, LR2, LR3, LR4 and LR5 (totaling 91.79 acres).  Except for parcel L5, these parcels

are roughly triangular and zig-zag along the edge of the Rio Grande National Forest a few miles southwest of Creede.[10]  Parcel L1 is adjacent to parcel LR1, parcel L2 is adjacent to parcel LR2, parcel L3 lies between parcels LR3 and LR4, and parcel L4 lies between parcels LR4 and LR5. Parcel L5 is a long parcel which lies across from the other L and LR parcels on the opposite side of the Rio Grande River.  The following two maps show the interrelation of these parcels:



--------

[10] Although not entirely clear from the maps in the record, the Court has attempted to discern the precise shape of each parcel and has highlighted each in blue ink.



MAP 4
AMENDED LOCATION MAP
RIO OXBOW EXCHANGE (NON-FEDERAL LAND)
Longridge (91.79 Acres)
Sections 4, 10, 11, 13, & 14, T40 N, R2W, N.M.P.M.
Mineral County, Colorado

Parcels N4, N5 and N6 are federal parcels located to the southwest of Creede which protrude from the Rio Grande National Forest into private lands.  Parcels N4 and N6 are rectangular and abut private property on three sides.  Parcel N5 is odd-shaped and has five sides abutting private property.  These parcels are depicted on the following map:



MAP 2
LOCATION MAP
RIO OXBOW LAND EXCHANGE
FEDERAL LANDS (112.1 Acres w/o N3)
Sections 25, 35, & 36, T40N., R2W
Section 30, T40N, R1W
Mineral County, Colorado

Federal parcel N1 is almost square and is surrounded by the Broadacres Ranch on three sides.  Federal parcel N2 is rectangular and abuts the Broadacres Ranch on two sides, but it also shares a boundary with a parcel owned by Plaintiff Charles Powers, who operates the Antlers Rio Grande Lodge at that location.  The relative locations of these parcels are shown below:



Non-federal parcels B3 and B4 comprise a total of 368.96 acres.  These parcels are wholly surrounded by the Rio Grande National Forest, and are located approximately 10 miles southwest of Monte Vista, Colorado, and approximately 50 miles southeast of Creede.  The Hays Placer and Continental Divide Claims (consisting of 25 small mining claims spanning 354.16 acres) are located near the Continental Divide approximately 24 miles west of Creede.[11]

**B.  Investigatory Process**

As part of its obligation to take a "hard look," the Agency engaged in an investigatory process.  It sought and received public comments and, in light of those comments, prepared a draft and a final EA.  Members of the Agency corresponded with each other throughout the process.  In light of this information, the Agency decided that the exchange would have no significant impact on the human environment.  As is apparent below, the Finding of No Significant Impact disregards or discounts the public comments and observations contained in the EA.

**Public Comments**

The record contains numerous comment letters, from both proponents and opponents of the exchange.[12]  Opponents argued that inclusion of parcels N2, L3 and L5 in the exchange would have a potentially significant impact on the human environment.  They were specifically concerned

---

[11] The maps contained in the administrative record of parcels B3, B4, the Hays Placer, and the Continental Divide Claims are too dark to replicate here.

[12] Legal notices inviting public comments over a 45-day period were published in the Monte Vista Journal, the Mineral County Miner, and The Silver World during April in May 2001.  Notices were also sent to state and local agencies, and elected officials.  The Agency's representatives explained the exchange at public meetings of the Mineral and Hinsdale Boards of County Commissioners.  A public meeting was also held on June 5, 2001 in Creede, Colorado.  The Agency received 95 written responses from individuals, non-governmental entities and public agencies after the notices were published.  It also received 23 written comments on the EA.

about the loss of recreational opportunities along the Rio Grande River (parcels N2 and L3), loss

of a geological site known as the Creede Formation (parcel N2), and potential development of the

parcels impeding the scenic value of the area (parcels N2 and L5).

Charles Powers, on his own behalf and on behalf of the Antlers Rio Grande Lodge, Inc.,

specifically objected to the loss of federal parcel N2 due to the its unique rock formation, wildlife

and scenery.  He advised that he owns land adjacent to parcel N2, and operates the Antlers Rio

Grande Lodge at that location.  Guests at the lodge frequently use parcel N2 for recreation and

would be deprived of the ability to visit the Creede Formation and fish in the Rio Grande River if

the parcel were transferred.  Mr. Powers attached documentation showing that the Creede

Formation is classified as G3, meaning it is rare, exists in fewer than 20 sites in the world, and

exists in fewer than 5 sites, nationally.  He also stated that the Anters Rio Grande Lodge stocks

the river with fish along parcel N2.

The Vice Chairman of the Mineral County Board of County Commissioners opposed the

exchange due to the loss of parcel N2, because it is used for float trip shore access, and loss of

this public land along the Rio Grande River would hurt the local economy.  The Board of County

Commissioners collectively stated that nowhere for 9 to 10 miles downstream from parcel N2 is

there a place for floaters to stop along the river.

The Western Land Exchange Project, a non-profit organization based in Seattle,

Washington, also advocated for federal retention of parcels N2 and L3 in order to preserve public

frontage on the river.  As to the loss of these parcels, another individual commented that there

would be a loss of 1600 feet of "fishable river," and there would be no public fishing on the river

below Box Canyon to Creede except for a small area above the Marshall Park Grounds.[13]   A

professor of geology from the University of Memphis in Tennessee confirmed that the Creede

Formation on parcel N2 is an "exceptional example" of a "'resurgent' caldera" consisting of

sedimentary and volcanic rocks, and rich in fossils, which is of value to geologists, geology

students, and rockhounds.

Other people complained that they would lose access to other particular recreation sites,

such as favorite hunting spots.  Many specifically objected to the exchange of parcel N2, and the

loss of access to fishing sites along the Rio Grande River.  Others observed that the exchange

would result in a loss of public land in Mineral County, and that the non-federal parcels to be

traded to the Agency were not near the town of Creede.

**The EA**

In its final EA, the Agency identified several key issues pertinent to deciding whether the

exchange may have a significant impact on the human environment.  It referred specifically to: (1)

loss of public lands along the Rio Grande River at federal parcels N2 and L3; (2) loss of

recreational opportunities at federal parcels N2, L3, N4 and L5, including loss of unrestricted

access to the Creede Formation on parcel N2; and (3) impact on visual quality if the land

(particularly parcels N2 and L5) is developed after being transferred to private interests.

The Agency noted that the Rio Grande Valley is a central feature of the Silver Thread

Scenic Byway which runs adjacent to the federal N and L parcels, giving them a "Scenic Integrity

---

[13] In approving the exchange, the Agency acknowledged that the exchange would result in a loss of
public recreational opportunities "on 1616 lineal feet of the Rio Grande and associated stream banks" at
federal parcels N2 and L3.  The Court is unclear what is meant by "lineal feet."  It is clear, however, that
the Agency was referring to a measurement of the Rio Grande River shoreline.

Objective of 'High'".  It acknowledged that lands which transfer into private ownership might be commercially developed, and this "could have substantial effects on the scenic values within this viewshed, particularly in foreground and middleground views."  The Agency also acknowledged recreational, archeological, historic and cultural significance of the area, including the "quaint historic communities of South Fork, Creede, and Lake City in the San Juan Mountains."  It also noted that there are five commercial outfitters which offer boat trips on the Rio Grande River, but stated that they currently must get permission from private landowners to "put-in and take-out, as well as float through private lands."

The Agency observed that parcel N2 has several unique attributes and offers a variety of recreational opportunities.  It noted that "[t]he cliff structures and associated geologic features offer opportunities for hobbyists to search for and collect fossils from the Creede Formation," and transfer of the parcel would limit the general public's ability to access the formation.  The Agency explained that if the exchange were allowed, only "qualified individuals" would be allowed to visit the Creede Formation for scientific, geologic and educational purposes, provided they obtained the Intervenors' consent and completed a waiver of liability.  It also acknowledged the possibility that a structure might be built on top of the Creede Formation, visible from the highway and to nearby inhabitants, which could bring the scenic value of this area from "high" to "none."  The Agency further stated that transfer of parcel N2 would eliminate access to the parcel by guests at the Antlers Resort, who hike and fish on the parcel.  It also acknowledged that commercial outfitters will no longer be able to come ashore on parcel N2, but instead would be required to float further down the river.

With regard to parcel L3, the Agency observed that it provides river access that would be

lost to the public.  It noted that there is a turnout on the highway at the edge of the parcel which provides limited parking, but the area has not been improved for river access, the river banks are covered with coarse rip-rap, and due to limited sight distance along the highway, there are safety reasons for not enlarging the parking area.  The Agency noted that, to mitigate the loss of river access at parcel L3, the Intervenors would improve river access by enlarging the parking area at the Rio Grande Campground.

With regard to parcel L5, the Agency addressed the possibility of later development.  It noted that the owner of the Rio Oxbow Ranch would be permitted to construct five residential dwellings and access roads within federal parcel L5.  Although the Agency anticipated that the dwellings would be constructed near the trees to obscure their visibility from the highway, it was uncertain whether this would be successful.  Up to five acres of forest could be removed.

As to the combined loss of recreational opportunities on parcels N2, L3, N4, N5 and N6, the Agency found in the EA that such losses could be mitigated, in part, by improvement of the river access at the Rio Grande Campground, continued (but limited) access to the Creede Formation, and the gain of acreage in Rio Grande and Hinsdale Counties (specifically, parcels B3, B4, the Hays Placer, and the Continental Divide Claims).  However, the Agency did not address past, present or reasonably foreseeable uses of neighboring properties of the federal and non-federal parcels subject to the exchange, or whether there have been prior land exchanges in the vicinity.

**Agency Documents and Correspondence**

The administrative record also contains numerous documents and pieces of correspondence between individuals working for the Agency.  All demonstrate the Agency's

inclination to approve the exchange even before the EA was finalized.   Many also display a sense of urgency to approve the exchange, without an EIS and regardless of what the final EA stated, in order to preserve use of the appraisals before they expired.

John Murphy[14] reviewed the draft EA.  He commented that: "On Page 54 of Chapter 4 in the second paragraph it says 'This could represent a potentially significant effect to the scenic value of this area.'  I suggest that a word other than 'significant' be used in this sentence.  If it is truly a significant effect it should lead us to doing and [sic] EIS rather than an EA."

Several e-mails specifically addressed the need to approve the exchange and enter into an exchange agreement before the appraisals expired at the end of January 2004.  In an e-mail dated November 5, 2003, Steven Rinella wrote to Pat Prentice: "[t]he only way to protect them [the appraisals] will be to have a binding exchange agreement in place before then, along with the accompanying decision."  That same day, Pat Prentice sent an e-mail to Les Dobson and Peter Clark addressing the need to equalize the values of land in the exchange, stating: "All will need to be done with sufficient lead time that we can make fixes and issue DN [Decision Notice] and execute exchange agreement before appraisals expire which is the end of January."  An e-mail dated November 10, 2003 from Pat Prentice to various individuals similarly stated: "The Exchange Agreement needs to be Executed before January 23 because some of the appraisals expire at that time.  We do have to have the decision made by that time[.]"  The e-mail further stated that if parcels were dropped from the exchange to equalize values, "[w]e also need to be cautious and not drop anything that is used for our justification for the exchange."  An e-mail

---

[14] It is not clear from the record who, exactly, John Murphy is.  Nonetheless, it is clear that he had authority to comment on the draft EA.

18

dated January 12, 2004 from Steven Rinella to several people stated that the appraisals would

expire on January 22, 2004, and that the decision needed to be signed on January 21, 2004.

## C. The Finding of No Significant Impact

At the heart of this appeal is the Agency's decision not to obtain an EIS and instead to

issue make a Finding of No Significant Impact.  The Finding of No Significant Impact was

purportedly premised upon comments received from the public and the EA.  As the following

findings demonstrate, the public comments and findings of the EA with regard to the effect of the

exchange on the human environment were discounted or ignored.

> **Consideration of unique characteristics of the geographic area.**
> The only "unique characteristics of the geographic area" as defined
> at 40 CFR 1508.27(3) which exist in the area are floodplains and
> wetlands.  The selected action would provide a net gain of wetlands
> and a net loss of floodplains.  All wetlands and floodplains lost from
> Federal ownership would be protected from development or other
> disturbances.

> **Consideration of the degree to which the effects are likely to be
> highly controversial.**  There are no scientific disputes over the
> likely effects of the project.  Controversial, with respect to its
> definition under the National Environmental Policy Act, applies to
> an agreement on the affects [sic] of an action, not to the
> popularity/acceptance of a proposed action.  Therefore; I conclude
> that the environmental effects of the decision will not be highly
> controversial. . . .

> **Consideration of the degree to which the action may adversely
> affect districts, sites, highways, structures, or objects listed or
> eligible for listing in the National Register of Historic Places, or
> cause loss or destruction of significant scientific, cultural, or
> historic resources.**  Cultural resource inventories were completed
> for NFS lands and the selected action will not affect any site,
> structure, or object.  The selected action will not cause loss or
> destruction of significant scientific, cultural, or historic resources.

## V.  Analysis

Generally, review under the APA of an agency's decision not to obtain an EIS and to instead made a Finding of No Significant Impact consists of both substantive and procedural components.  *See Davis,* 302 F.3d at  1112.  Substantively, the Court determines whether the agency made a clear error in judgment.  *Id.*  Procedurally, the Court looks to whether the agency followed applicable procedures.  *Id.*

As discussed *supra,* an EIS is required when federal action may "significantly" affect the quality of the human environment.  The "human environment" includes "the natural and physical environment and the relationship of people with that environment."  40 C.F.R. § 1508.14.  To determine whether a proposed action may "significantly" affect the human environment, an agency first considers the context of the proposed action under 40 C.F.R. § 1508.27(a):

> This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

The agency should also consider the intensity of the proposed action, meaning the severity of any impact, by considering some or all of the factors set forth in 40 C.F.R. § 1508.27(b):

> (1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.
> (2) The degree to which the proposed action affects  public health or safety.
> (3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.
> (4) The degree to which the effects on the quality of the human

20

environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

Having reviewed the record in light of these factors, the Court concludes that the Agency's decision not to obtain an EIS and instead to find that the exchange would have no significant impact on the human environment violated NEPA, at least as to parcels N2, L3 and L5. In its Finding of No Significant Impact, the Agency deprecated – and in some instances ignored – numerous repetitive, corroborated actual or potential impacts on the human environment resulting from the loss of parcels N2, L3 and L5.

## Unique Characteristics of the Geographic Area

Under the exchange, the general public loses all access to parcel N2, which has several unique features of claimed value to the public.  Chief among these are the Creede Formation and

roughly 1600 feet of Rio Grande shoreline.  In addressing "unique characteristics of the geographic area," the Finding of No Significant Impact completely disregards both the Creede Formation and the Rio Grande shoreline.

The record shows that the Creede Formation is an extremely rare formation, valuable to scientists and rockhounds.  There are perhaps fewer than five such formations in the United States.  If the exchange occurs, only particular individuals will be allowed to visit the Creede Formation, and only if they first obtain permission from the Intervenors and complete a waiver of liability.

Public comments advised the Agency that the loss of Rio Grande shoreline at parcels N2 and L3 would deprive fishermen of prime fishing habitat.  The County Commissioners and others also advised the Agency that the loss of parcel N2 would mean that boaters, including those participating in commercial boat trips, could not come ashore for at least 9 or 10 miles along the river.  The first available shore access would be Wagon Wheel Gap, which is located approximately 10 miles southeast of Creede.  In its Finding of No Significant Impact, the Agency disregarded these comments and failed to address what other opportunities exist for fisherman in the Rio Grande Valley, and why the loss of parcels N2 and L3 is not significant.

### **Highly Controversial Effects**

The Agency also disregarded the controversial effects of the exchange.  It concluded that under NEPA, the popularity and acceptance of a proposed action is not pertinent to whether an action's effects are controversial, and thus disregarded public opposition to the exchange.  It is true that the focus is upon the effects of a proposed action, rather than the action's popularity as a general matter.  However, the effects of the exchange in this case are highly controversial, as

evidenced by the number of public comments received by the Agency.  Although objectors focused their complaints upon the loss of parcel N2 and its specific recreational or scenic value to them, they also complained that the non-federal lands located in other counties would not benefit them if the exchange were completed.

It is significant that most of the non-federal parcels in the exchange are not near the town of Creede.  The Hays Placer and Continental Divide Claims are approximately 24 miles west of Creede, and parcels B3 and B4 appear to be approximately 50 miles southeast of Creede. Together, these parcels comprise 723.12 out of the 814.91 acres of private land to be transferred to public ownership.  The recreational uses of such land are qualitatively different from the recreational uses of federal parcel N2.  Some or all of the parcels offer hunting, hiking, and back road driving opportunities, as well as access to the historic Carson townsite.  However, the parcels possess no resurgent calderas like the Creede Formation, and none border the Rio Grande River.  Therefore, the Creede community would not necessarily benefit from the exchange.  The Agency did not consider how the widespread nature of the non-federal parcels, or their different uses, could impact people locally.

### Effects Upon Sites and Highways

The Agency also disregarded impacts on scenery.  As is apparent from both the EA and Decision Notice, the Agency anticipated that a structure might be built above the Creede Formation which would be visible from the Silver Thread Scenic Byway, bringing the scenic value of the area from "high" to "none."[15]  It also anticipated that five structures would be built on

_____

[15] Possible development above the Creede Formation, combined with the loss of general public access to the formation, likely require preparation of an EIS all by themselves.

parcel L5, which has a "Scenic Integrity Objective of 'High.'" Although the Agency believed that the structures on parcel L5 could be built under tree cover, it was uncertain what the exact locations of the structures would be and the extent to which they may impact the scenic integrity of the area. At the very least, this development has the potential to have a significant impact on the human environment.

### Prejudgment of Issues

Finally, and most troubling, is the correspondence in the record that suggests that the approval decision and Finding of No Significant Impact were predetermined, and therefore unaffected by either the public comment or the EA. As of December 2002, the draft EA stated that there was a "potentially significant effect to the scenic value of the area." After John Murphy commented that such language would require preparation of an EIS, the language in the EA was changed to state that there "could be substantial effects on the scenic values within this viewshed." This either downgrades the initial assessment – perhaps for the very purpose of avoiding preparation of an EIS – or it confirms the need for further environmental study. E-mails exchanged during November of 2003 – two months before the EA was finalized – focused upon the need to approve the exchange and enter into an exchange agreement before the appraisals expired.

### Conclusion

NEPA required the Agency to take a "hard look" at the potential consequences of the exchange. In light of the information in the EA and the public comments, the Agency erred in its decision not to obtain an EIS and instead issue a Finding of No Significant Impact. At the very least, the EA and comments show that the exchange **may** have a significant impact upon the

human environment.  As a consequence, the Agency was required to obtain an EIS to gain more information about the possible impact of the exchange.  The decision to approve the exchange without an EIS was the product of an incomplete process, and therefore arbitrary and capricious.

It is neither this Court's function, nor intention, to speculate as to whether the exchange should occur.  That is a matter for the Agency to determine.[16]  This matter will be remanded to the Agency for purposes of preparing an EIS to assess the impact of the exchange upon the human environment.  In light of such remand, and the varying impacts an EIS could have on the remainder of the Agency's decision process, there is no need to address the Plaintiffs' remaining claims.

**IT IS THEREFORE ORDERED** that:

(1)     The decision to issue a Finding of No Significant Impact, and consequent decision to approve the exchange, are **REVERSED** and the matter is **REMANDED** to the Agency for preparation of an EIS (environmental impact statement).

(2)     The Clerk of Court is directed to close this case.

Dated this 17th day of May, 2007

**BY THE COURT:**

Marcia S. Krieger
United States District Judge

---

[16] When a proposed action will significantly affect the quality of the human environment, it does not mean that the proposed action will be prohibited.  The purpose of an EIS is to assess what the environmental impact of a proposed action might be, not to avoid such impact.  *See Committee to Preserve Boomer Lake Park*, 4 F.3d at 1554. NEPA does not require a particular substantive outcome.  *See Citizens' Committee to Save Our Canyons*, 297 F.3d at 1022.